(C.D. 4128)

PITTSBURGH PLATE GLASS CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 18, 1970)

*Barnes, Richardson & Colburn* (*Earl R. Lidstrom* of counsel) ; *John P. S. O'Connor* associate counsel ; for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*John A. Winters* and *Morris Braverman*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: The merchandise involved in this case consists of parts of an "undercleaner" designed for use in connection with the production of glass by the "float" glass method, imported from Belgium in four different shipments, covered by four entries. Four protests have been filed against one entry and one protest against three entries. These five protests were consolidated at the trial.

Most of the merchandise was assessed with duty at 14 per centum ad valorem under item 674.53 of the Tariff Schedules of the United States, as parts of machine tools. Certain of the merchandise covered by entry 9073 was classified otherwise as follows:

Retraction gear boxes at $2.25 each +35 per centum ad valorem under item 680.47, as other speed changers (protest 66/74299) ;

Pulleys, motor pulleys, and belts, at 19 per centum ad valorem under item 680.50, as pulleys and parts thereof (protest 66/74297) ;

Stromag clutches at 19 per centum ad valorem under item 680.54 as clutches (protest 66/74300).

It is claimed in the protests that the mechandise is properly dutiable at 10 per centum ad valorem under item 678.50, as parts of machines, not specially provided for. In addition an alternate claim was made at the trial that the gear boxes are properly dutiable at 9 per centum ad valorem under item 680.45, as originally enacted, as fixed ratio speed changers, or, under said item as amended by Public Law 89–241, as multiple and variable ratio speed changers each ratio of which is selected by manual manipulation.

The pertinent provisions of the tariff schedules are as follows:

Work and tool holders and other parts of, and accessories used principally with, machine tools; * * *:

\*      \*      \*      \*      \*      \*      \*

Other:
  Parts:

\*   \*   \*   \*   \*   \*   \*

    Other:

| | | |
|---|---|---|
| 674.52 | Parts of metal-working machine tools for cutting or hobbing gears_ | \* \* \* |
| 674.53 | Other parts_ _ _ _ _ _ _ _ _ _ _ _ | 14% ad val. |

\*   \*   \*   \*   \*

| | | |
|---|---|---|
| 678.50 | Machines not specially provided for, and parts thereof_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 10% ad val. |

\*   \*   \*   \*   \*   \*   \*

Gear boxes and other speed changers with fixed multiple, or variable ratios; pulleys, pillow blocks, and shaft couplings; \* \* \* clutches; \* \* \* all the foregoing and parts thereof \* \* \*:
  Gear boxes and other speed changers, and parts thereof:

| | | |
|---|---|---|
| 680.45 | Fixed ratio speed changers, and parts thereof_ _ _ _ _ _ _ _ _ _ _ _ _ | 9% ad val. |
| 680.47 | Other speed changers_ _ _ _ _ _ _ _ | $2.25 each + 35% ad val. |

\*   \*   \*   \*   \*

| | | |
|---|---|---|
| 680.50 | Pulleys, pillow blocks, shaft couplings, and parts thereof_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 19% ad val. |

\*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| 680.54 | Chain sprockets, clutches, universal joints, and parts thereof_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | 19% ad val. |

Item 680.45 was amended by Public Law 89–241 to read:

| | | |
|---|---|---|
| 680.45 | Fixed ratio speed changers, multiple and variable ratio speed changers each ratio of which is selected by manual manipulation, and parts thereof_ _ _ _ _ _ _ _ _ _ _ _ | 9% ad val. |

The record in this case consists of the testimony of one witness, called by the plaintiff, and five exhibits.

Perry D. Duncan, an employee of PPG Industries, which manufactures plate and float glass at its plant in Crystal City, Missouri, testified that he was at the time of trial superintendent of the maintenance department. He had been with the firm for 15 years and had previously been project engineer for float installation and assistant superintendent of engineering. He holds a B.S. degree in mechanical engineering from the University of Missouri. His work as assistant superintendent of engineering involved the preliminary design of the float line, along with designing other equipment at the plant. The engineering department participated in setting specifications for the

involved merchandise. It arrived in 1964 but installation did not start until 1965. At that time it was the duty of the witness to see that the float line equipment was installed according to specifications, put in operating condition, and turned over to the plant for production purposes.

The witness testified that glass is produced by two methods at the Crystal City plant. The new float method and the older plate glass method. He described the float method as follows: The raw materials are mixed in the batch house and are transported to the float tank or furnace where they are heated at a high temperature and form a molten mass. From there, the mass flows into a molten tin bath where it actually floats on the molten tin, giving it its final characteristics. It then goes into the cooling lehr where the ribbon of glass is cooled to room temperature. After that it goes into the cleaning station which involves three processes: The juice box, the undercleaner, and a detergent washer. After inspection, the ribbon is conveyed to a cutter which cuts the ribbon into individual sheets. The sheets are either stacked for future use or conveyed to a further cutting line where they may be cut into smaller sizes and packed and shipped to customers.

The purpose of the juice box and the undercleaner is to remove any film or thin layer of tin which the glass may have picked up in the molten tin bath. This would consist of a small amount of tin which may adhere to the glass physically. It is very hard to see but is enough to obscure vision through the glass.

The juice box or first stage was designed to do the major work in removing the tin by means of an acid spray and the undercleaner was to remove or clean any film that still remained adhering to the glass.

The undercleaner has revolving heads that have a felt pad on top of them. A mixture of rouge is introduced into the felt and as the heads revolve the friction cleans the residue of film from the glass. Rouge is used as a cleaner and as a lubricant between the glass and the felt pads. The action of the cleaner does not remove any portion of the glass, change its shape or affect it at all. The rouge assists in removing or cleaning the tin from the surface of the glass. The undercleaner is not used to cut away or remove any of the glass and is not capable of doing so.

According to the witness the spray and the undercleaner were never in fact used in the course of manufacturing float glass because the bottom surface of the glass was never produced with the film of tin as it was originally thought it would be. The machine did have a trial run and the witness had occasion at that time to observe the work done by it.

Photographs of the undercleaner were received in evidence as exhibits 2a through 2g. These photographs and the testimony of the witness establish that the retraction gear boxes, the stromag clutch, and the pulleys are parts of the undercleaner.

The function of the gear boxes, according to the witness, is to move the undercleaner in or out from under the ribbon of glass. It is connected to a motor and a drive gear and changes the higher speed of the motor to a lower speed for the drive gear. The speed is changed at a certain ratio which cannot be altered during the operation. The ratio cannot be changed unless the unit is disassembled and a different gear box put in.

Glass is produced by the plate glass method in a somewhat different manner. After the glass comes out of the plate tank, it has a knurled surface, which is imparted by the rolls in the tank. These knurls or indentations are removed by grinders. According to the witness, the undercleaner designed for the float glass method does not have the capacity to remove knurls.

Exhibit 3 is a sample of glass obtained from the float line after it has gone through the cooling lehr. It is a piece of clear transparent flat glass. Exhibit 4 is a sample of glass obtained from the plate glass line after the cooling lehr. It consists of knurled flat glass which is translucent but not transparent. Exhibit 5 is a sample of glass obtained from the plate glass line after grinding and polishing. It is clear, transparent flat glass, the same as or similar to exhibit 3.

The principal claim before the court is that the undercleaner is a machine but not a machine tool and that therefore the imported parts are properly classifiable under item 678.50, as parts of machines.

Some of the merchandise, however, was classified under *eo nomine* provisions for pulleys (item 680.50), clutches (item 680.54), and speed changers (item 680.47). The evidence indicates that these articles are in fact pulleys, clutches, and gear boxes (speed changers). Thus, General Interpretative Rule 10(ij) is applicable. It provides:

> (ij) a provision for "parts" of an article * * * does not prevail over a specific provision for such part.

Therefore, whether the pulleys, clutches, and gear boxes are parts of machines or of machine tools, they must be classified under the specific provisions therefor. *J. E. Bernard & Co., Inc.* v. *United States*, 59 Cust. Ct. 31, C.D. 3060 (1967) ; *C. F. Liebert* v. *United States*, 60 Cust. Ct. 677, C.D. 3499, 287 F. Supp. 1008 (1968) ; *Thornley & Pitt et al.* v. *United States*, 63 Cust. Ct. 536, C.D. 3949 (1969). Plaintiff's claim that they are classifiable as parts of machines is overruled.

An alternative claim has been made as to the gear boxes. They were classified under item 680.47, as speed changers other than fixed ratio speed changers, and it is claimed that they are fixed ratio speed

changers classifiable under item 680.45 at 9 per centum ad valorem.[1] The testimony of Mr. Duncan, a mechanical engineer, is sufficient, in the absence of other evidence, to establish that the gear box is a fixed ratio speed changer. Plaintiff's alternative claim as to the gear box is sustained.

The term "machine tool" is defined in headnote 1(a) to subpart 4F, schedule 6, so far as here pertinent, as follows:

> 1. For the purposes of this subpart—
> (a) the term "machine tool" means any machine used for shaping or surface-working—
>
> \*        \*        \*        \*        \*        \*        \*
>
> (ii) * * * glass in the cold;
>
> \*        \*        \*        \*        \*        \*        \*
>
> whether by cutting away or otherwise removing the material or by changing its shape or form without removing any of it, * * *

The question is whether the undercleaner "is used for shaping or surface-working * * * by cutting away or otherwise removing the material or by changing its shape or form." The testimony indicates that the machine was designed to remove from the glass a residue or film of tin which might adhere to the glass after it left the tin bath and had gone through the juice box stage. This was to be done through the frictional operation of revolving heads having a felt pad into which rouge had been introduced. Essentially, this was a cleaning operation designed to remove a film of tin so minute as to be almost invisible. The undercleaner did not cut the glass or remove any portion of it or change its shape or form. It was designed for removing foreign material from the surface of the glass, not for work on the glass *per se*.

It has been held in prior cases that air guns used to remove slag, scale, rust and contaminants from various materials were not machine tools within the meaning of the Tariff Act of 1930, nor tools suitable for metal-working within the meaning of the Tariff Schedules of the United States. *Mattoon & Company, Inc., et al.* v. *United States*, 54 Cust. Ct. 282, C.D. 2545 (1965); *Mattoon & Company et al.* v. *United States*, 62 Cust. Ct. 291, C.D. 3747, 297 F. Supp. 1404 (1969).

From the testimony in the case first cited it appears that the Von Arx air guns, when used with a cluster of needles, drive the needles forward with each seeking its own elevation and allowing them to strike any contour or surface; that there is a constant peening action or vibrating action against the surface, which removes slag, scale, or paint; that "industrial slag" is a build-up of material through chemical means or through the settlement of foreign matter on a surface, and that slag can be a chemical or a crust of material superimposed

---

[1] The claim stated at the trial under item 680.45, as amended by Public Law 89–241, appears to have been abandoned.

upon the original surface. The court held that the article was not a machine tool under the Tariff Act of 1930, stating (p. 286) :

> While in a broad sense the Von Arx air gun might be said to work on metal, it seems clear that the removal of slag, scale, rust, or contaminants from metal does not remotely resemble in function the exemplars set forth in the Summaries of Tariff Information (1948) quoted, *supra*. In our opinion, based upon the record herein, aside from the fact that the merchandise in question is used to clean stone and concrete, the Von Arx air gun is not one which works on metal within the intendment of the provisions contained in paragraph 372, *supra*, and, further, it does not advance or improve the metal for further use.

In the second *Mattoon* case, the issue was whether the Von Arx air guns were classifiable under item 674.60 of the Tariff Schedules of the United States, as hand-directed or hand-controlled pneumatic tools suitable for metal-working, or under item 674.70, as other hand-directed or hand-controlled tools. The court described the use of the Von Arx air gun as follows (pp. 293–294) :

> The Von Arx Air Gun is used on many metals and many surfaces other than metal such as stone or concrete and is used for the removing of foreign material, oxidation, commonly called rust, barnacles, and splashes of concrete. It is used for preparing the surface of metals in the sense that it removes foreign materials from the metal surfaces. The air gun does not cut the metal or remove the metal in any case and would be inefficient for such use.

The court held that the tool was not suitable for metal-working within the meaning of the tariff statutes. The court quoted the following from *United States* v. *Kurt Orban Co., Inc.*, 47 CCPA 28, 30–31, C.A.D. 724 (1959) :

> The word "work" is susceptible of such a wide variety of meaning that we have grave doubts Congress intended it to be construed as broadly as the Government urges. For example, in a broad sense any tool which changes the shape, size, or even the position of a piece of metal in any manner and for any purpose may be literally said to do "work" on it, even though the nature of that particular "work" be wholly incidental to the primary function of the device. Under such circumstances there is a substantial doubt in our mind that Congress intended that word to be given such a broad construction, and we think it proper to resolve that doubt in favor of the importer. *United States* v. *Sussfeld*, 1 Ct. Cust. Appls. 51, T.D. 31030; *Woolworth* v. *United States*, 1 Ct. Cust. Appls. 120, T.D. 31119; and *Downing & Co. (Inc.)* v. *United States*, 12 Ct. Cust. Appls. 451, T.D. 40614.

In our view the undercleaner involved herein does no more than the Von Arx air guns, that is, it removes foreign material superimposed

upon the surface of the glass. It is not a machine tool within the meaning of that term as intended by Congress.

Accordingly, the parts of the undercleaner for which there are no specific provisions are classifiable as parts of machines, not specially provided for, and not as parts of machine tools.

Protest 66/74299 is sustained as to the claim that the retraction gear boxes covered thereby are properly dutiable at 9 per centum ad valorem under item 680.45, Tariff Schedules of the United States, as fixed ratio speed changers, and overruled as to all other claims. Protests 66/74298 and 66/74302 are sustained and the merchandise covered thereby is held dutiable at 10 per centum ad valorem under item 678.50, as parts of machines, not specially provided for. Protest 67/74297 covering pulleys, motor pulleys, and belts, and protest 66/74300 covering stromag clutches are overruled. Judgment will be entered accordingly.